USCA1 Opinion

 

 United States Court of Appeals
 For the First Circuit

No. 98-2061

 TOWN OF AMHERST, NEW HAMPSHIRE,

 Defendant, Appellant,

 v.

 OMNIPOINT COMMUNICATIONS ENTERPRISES, INC.,

 Plaintiff, Appellee.

 APPEAL FROM THE UNITED STATES DISTRICT COURT

 FOR THE DISTRICT OF NEW HAMPSHIRE

 [Hon. Joseph A. DiClerico, Jr., U.S. District Judge]

 Before

 Boudin, Circuit Judge,
 
 Bownes, Senior Circuit Judge,
 
 and Lynch, Circuit Judge.
 
 

 Robert D. Ciandella with whom Philip L. Pettis and Donahue,
Tucker & Ciandella were on brief for appellant.
 Steven E. Grill with whom Daniel E. Will and Devine, Millimet
& Branch, P.C. were on brief for appellee.

March 30, 1999

 
 

 BOUDIN, Circuit Judge. This is an appeal by the Town of
Amherst, New Hampshire, from an injunction granted by the district
court. The injunction, granted on cross-motions for summary
judgment, directed the town to grant permits to Omnipoint
Communications Enterprises, Inc. ("Omnipoint"), to build facilities
to provide wireless telephone services. The case presents
difficult issues under the Telecommuncations Act of 1996, 47 U.S.C.
 151 et seq. The background events are generally undisputed. 
 Omnipoint is a major provider of wireless telephone
service to the public. In March 1997 or thereabouts, Omnipoint
began designing a wireless digital system for southern New
Hampshire. In that same month, the Town of Amherst adopted at the
town meeting an ordinance governing the placement of wireless
communications facilities in the town. See Amherst, N.H.,
Ordinance (Mar. 11, 1997) ("the March 1997 ordinance"). The town
meeting also authorized the town Board of Selectmen ("the
Selectmen") to make agreements with carriers to site towers on town
properties. Under New Hampshire law, the town meeting legislates
for the town and the Selectmen are the principal executive body. 
See N.H. Rev. Stat. Ann. 672 et seq.
 For zoning purposes, Amherst is divided into 13
districts. The March 1997 ordinance prohibits siting of the towers
in four of the districts, although those prohibitions may be
overcome if a variance is obtained. In four other districts,
towers are allowed only through the grant of a "special exception";
the conditions for such a special exception are set out in the
ordinance. The ordinance also imposes setback requirements for
towers in the "allowed" districts, requiring towers to be set back
at least 500 feet from Route 101, set back twice the tower height
from residential property lines, and set back a distance equivalent
to the tower height from all other roads and certain other
prescribed areas. See id.
 In April 1997, the Amherst Selectmen began negotiating
with Omnipoint and also advertised to solicit interest from other
carriers who might wish to locate a system in Amherst. Omnipoint
then designed a system comprising four 190-foot towers--tall enough
to allow co-location of antennas by up to four other providers who
might compete with Omnipoint. Towers are very expensive, often
costing $500,000 or so each; co-location increases tower height but
reduces the number of towers and greatly reduces overall costs
because fewer towers are needed and because a tower's cost does not
increase proportionately with height.
 In late April 1997, the Federal Communications Commission 
granted Omnipoint a non-exclusive license to provide wireless
digital telephone service in New England, including southern New
Hampshire. Under the license, Omnipoint must make service
available to 25 percent of the population in the region within five
years and 50 percent within ten years. Omnipoint wants to provide
service not only within the town of Amherst but also for transients
who are using Route 101, an important travel route in southern New
Hampshire that traverses Amherst, running roughly from northeast to
southwest. 
 Omnipoint and the Selectmen reached agreement in August
1997 and signed leases for three town-owned sites along Route 101;
on each, Omnipoint proposed to construct a 190-foot tower. It was
also agreed that the town would receive a portion of revenue from
Omnipoint and any other providers co-locating on the towers
constructed on town-owned land. The Selectmen wrote a letter
endorsing the proposed towers to the Amherst Zoning Board of
Adjustment ("the Board"), a separate local body that regulates
zoning matters. See N.H. Rev. Stat. Ann. 674:33. The leases
made clear that the responsibility to procure Board approval rested
on Omnipoint's shoulders. 
 Starting in the northeast, the first tower was to be
sited near the northern entrance to the town on the so-called
Bragdon Farm site owned by the town. Construction of this tower
required a special exception under the Amherst ordinance and two
variances from the setback restrictions from the Board; no use
variance was required. This was also true of the second site on
which a town-owned recycling center was located. Under state law,
variances require a showing of hardship. See note 6, below.
 The third tower site agreed to by the Selectmen--clearly
the most controversial--was a town-owned "public safety" complex
where a somewhat shorter tower already exists for wireless
communication by the police and fire department. Omnipoint
proposed to construct a 190-foot tower that could also be used by
the police and fire department. However, this area is denominated
a historic district and siting towers in such a district is
prohibited under the town's March 1997 zoning ordinance absent a
use variance. Thus, Omnipoint required a use variance, a setback
variance, and a separate permit from the Historic District
Commission, another local body.
 Omnipoint also reached agreement with a church to locate
a fourth tower on church land near Route 101. The fourth site was
in a district where a tower could be constructed with a special
exception and, in this case, with one setback variance. This area,
located to the south of the other proposed sites, lay just north of
the main population center in Amherst. Omnipoint also applied for
and secured a single site in the southern area of the town--where
neither special exception nor variance was required and neither,
therefore, was Board approval. There is no indication that service
for Amherst can be provided using this single tower. 
 In early September 1997, Omnipoint applied to the Board
for the required special exceptions and variances on all four
sites. It also applied to the Historic District Commission for
approval to construct on the site located at the safety complex. 
On September 16, 1997, Omnipoint made a presentation before the
Board, which received public comment and then deferred matters
until October. The Board's minutes summarize such oral
presentations but no transcript exists. Two days later, the
Historic District Commission met in public session and denied
Omnipoint's application, apparently in Omnipoint's absence.
 Omnipoint immediately appealed the Commission's decision
to the Zoning Board of Adjustment, which can override the Historic
District Commission. On October 21, 1997, the Zoning Board met
again. Omnipoint provided additional information and answered more
questions from the Board, and public comments were again taken. 
The hearing was continued until November 1997, when the same
process was repeated. The Board then deferred decision until
December 1997, saying that there would be no more presentations or
public testimony. At all of these meetings, a number of residents
questioned or opposed the project, citing primarily concerns about
visual blight and impairment of property values.
 On December 8, 1997, Omnipoint filed the present lawsuit
against the town asserting that Amherst's delay violated the
Telecommunications Act of 1996. Under this statute, the FCC
licenses carriers to provide wireless telephone service on a
competitive basis. 47 U.S.C. 332(c). Rate regulation by states
is precluded, unless special circumstances are shown. See id. 
332(c)(3). However, the statute preserves state and local
authority over the placement and construction of facilities, id. 
332(c)(7)(A), subject to five limitations, id. 332(c)(7)(B).
 The first limitation, contained in subsection (i) and
central to this case, includes two substantive constraints:
 (i) the regulation of the placement,
 construction, and modification of personal
 wireless service facilities by any State or
 local government or instrumentality thereof--
 
 (I) shall not unreasonably
 discriminate among providers of functionally
 equivalent services; and

 (II) shall not prohibit or have the
 effect of prohibiting the provision of
 personal wireless services.

47 U.S.C. 332(c)(7)(B)(i) (emphasis added). Amherst does not
dispute that Omnipoint's service is a "personal wireless service." 
Id. 332(7)(c).
 Three of the four remaining limitations are pertinent
here: the local government must act on placement or construction
applications "within a reasonable period of time"; the denial of a
request "shall be in writing and supported by substantial evidence
contained in a written record"; and anyone adversely affected by
any final action "or failure to act" by local government that is
inconsistent with the limitations may seek review in "any court of
competent jurisdiction" and "[t]he court shall hear and decide such
action on an expedited basis." 47 U.S.C. 332(c)(7)(B)(ii),
(iii), (v). 
 On December 16, 1997, eight days after the lawsuit was
filed, the Zoning Board of Adjustment met and unanimously denied
all of Omnipoint's applications for special exceptions and
variances and also denied its appeal from the decision of Historic
District Commission. In early January 1998, Omnipoint amended its
district court complaint to challenge the denials and also
requested the Board to reconsider its decisions. Shortly
thereafter, Omnipoint moved for summary judgment in the district
court.
 In response to Omnipoint's request for reconsideration,
the Board held a new hearing in February 1998. Omnipoint offered
no new evidence, but the Board heard additional public comment. On
March 16, 1998, the Board issued a further decision, denying
Omnipoint's request for reconsideration and issuing a more
extensive decision. The Board expressed general concerns about
tower height and the impact on town character and property values,
and then explained one by one--albeit in boilerplate language--why
the individual variances or special exceptions sought did not meet
specific requirements of state law or the March 1997 ordinance. 
For example, in rejecting Omnipoint's request for a setback
variance at the Bragdon Farm site, the Board stated in its
"findings of fact" simply that "[t]he proposed tower does not meet
the spirit and intent of the Amherst Master Plan to maintain the
rural character of the northern entrance to the Town."
 Later, after Omnipoint further amended its complaint,
Amherst cross-moved for summary judgment. In July 1998, a hearing
was held in the district court on the cross-motions. Within six
weeks, the district court issued a 47-page memorandum opinion
analyzing the issues in detail and concluding that the town had
violated the requirement that the local regulation "shall not
prohibit or have the effect of prohibiting the provision of
personal wireless services." 47 U.S.C. 332(7)(B)(i)(II); seeOmnipoint Communications Enters., Inc. v. Town of Amherst, No. 97-
614-JD (D.N.H. filed Aug. 21, 1998). The district court rejected
Omnipoint's claim that the Board had unreasonably delayed decision,
and it did not resolve the question of whether the denial was based
on substantial evidence. Id.
 In finding an effective prohibition, the district court
stressed that the Board's denial rested on very general standards
and did not give any indication as to how the plaintiffs could
overcome the "amorphous concerns" expressed or offer any guidance
as to where towers could be located to construct a functioning
system. The court concluded that a mandatory injunction would
issue directing the town to issue the necessary permits within 45
days. We stayed the district court's injunction pending an
expedited appeal. On this appeal, we review the grant of summary
judgment in favor of Omnipoint de novo, drawing inferences in favor
of the town. See Woods v. Friction Materials, Inc., 30 F.3d 255,
259 (1st Cir. 1994).
 The statutory provision before us, 47 U.S.C. 332(c)(7),
is a deliberate compromise between two competing aims--to
facilitate nationally the growth of wireless telephone service and
to maintain substantial local control over siting of towers. 
There are already two circuit decisions and several dozen district
court decisions addressed to one or more of the half-dozen
recurring issues under the statute. One of those issues, and the
ground for the district court's injunction in this case, is
Congress' mandate that no "regulation" of siting is permitted that
has "the effect of prohibiting" service. 47 U.S.C. 
332(c)(7)(B)(i)(II).
 On appeal, the town argues that this "effect" provision
was never intended to constrain individual town-permitting
decisions but was directed only against "general" bans, whether
explicit or implicit. There is some nominal conflict in the case
law on this point, but the quarrel is more one of language than
substance. Obviously, an individual denial is not automatically a
forbidden prohibition violating the "effects" provision. But
neither can we rule out the possibility that--based on language or
circumstances--some individual decisions could be shown to reflect,
or represent, an effective prohibition on personal wireless
service.
 Suppose, for example, that in denying an individual
permit, the town zoning authority announces that no towers will
ever be allowed or sets out criteria that no one could meet. The
fact that the ban is embodied in an individual decision does not
immunize it. It is no answer to point to the requirement that
individual decisions be based on "substantial evidence," for this
surely refers to the need for substantial evidence under the
criteria laid down by the zoning law itself (e.g., for setbacks,
conditions for variances, special exception requirements). See,
e.g., Cellular Tel. Co. v. Town of Oyster Bay, 166 F.3d 490, 494-97
(2d Cir. 1999). 
 If the criteria or their administration effectively
preclude towers no matter what the carrier does, they may amount to
a ban "in effect" even though substantial evidence will almost
certainly exist for the denial. See Virginia Metronet, Inc. v.
Board of Supervisors, 984 F. Supp. 966, 970 (E.D. Va. 1998). In
that event, the regulation is unlawful under the statute's "effect"
provision. But the burden for the carrier invoking this provision
is a heavy one: to show from language or circumstances not just
that this application has been rejected but that further reasonable
efforts are so likely to be fruitless that it is a waste of time
even to try.
 In this case, Amherst has not formally banned towers,
compare Sprint Spectrum, L.P. v. City of Medina, 924 F. Supp. 1036,
1038-39 (W.D. Wash. 1996), but rather required prior permission
case by case. And on this record, there is no showing of such
fixed hostility by the Board that one can conclude that further
applications would be useless. While some of the Amherst citizens
who testified evidently oppose any system in the town, several
board members stressed that their concern was primarily with the
190-foot size and that negotiations with Omnipoint would be
welcome. If these statements were mere camouflage, this has yet to
be shown.
 Were Omnipoint's existing proposal the only feasible
plan, then prohibiting its plan might amount to prohibiting
personal wireless service. However, what the record shows on this
point, and we have read it end to end, can be summarized as
follows. It appears that Omnipoint has proposed a traditional
efficient system that uses standard height towers at optimal
locations, minimizing both the total number of towers needed for
service and the overall cost for itself and for other carriers that
may wish to co-locate. Three of the sites have the added advantage
of generating revenue for the town and upgrading fire and police
communications.
 But it also appears that lower towers could be used (and
possibly resited) if co-location were sacrificed and more (perhaps
many more) towers were added. At this point, certainty dissolves. 
At the town meeting, opponents offered some "evidence" that a
feasible system could be constructed of very short towers, possibly
disguised as trees. Omnipoint strongly disputed such claims--which
may well be fantasy--but it practically admitted that somewhatlower towers were technically feasible. Nor is it clear that
locating a tower within the historic district is technically
essential.
 Ultimately, we are in the realm of trade-offs: on one
side are the opportunity for the carrier to save costs, pay more to
the town, and reduce the number of towers; on the other are more
costs, more towers, but possibly less offensive sites and somewhat
shorter towers. Omnipoint may think that even from an aesthetic
standpoint, its solution is best. But subject to an outer limit,
such choices are just what Congress has reserved to the town. SeeAT&T Wireless PCS, Inc., 155 F.3d at 428-29. We need not decide
now whether and to what extent legitimate zoning requirements could
require a carrier to accept a wireless system that is functional
but offers less than perfect performance.
 Omnipoint did not present serious alternatives to the
town. As it explained to the Board, it bowed to the Selectmen's
wishes to use town sites and to maximize the opportunities for co-
location. Further, detailed site planning is quite expensive,
leases or options take time to procure, and even one set of
variance and special exception requests is costly and time
consuming. This one-proposal strategy may have been a sound
business gamble, but it does not prove that the town has in effect
banned personal wireless communication. 
 Omnipoint's stronger claim under the "effect" provision
is that even if it might propose other solutions, none has any real
prospect of success before the Board because no applicant can
satisfy local requirements. In a nutshell, the Amherst ordinance
seemingly requires some form of permission (special exception,
variance or otherwise) for any system; the requirements for a
variance under state law can be made very severe by insisting that
no alternative reasonable use for the land exist; and special
exceptions under the Amherst ordinance have conditions so broad and
general that a hostile Board might be able to find substantial
evidence for every negative ruling. See note 2, above.
 The concern should not be overstated, since special
exceptions are a matter of right where the conditions are met, and
the state courts are available to review the denial of any special
exception or variance. Still, Omnipoint's claim is not frivolous. 
Possibly it would have a difficult time showing conclusively that
there is no other use for the sites (allegedly the requirement for
a use variance) or that the towers are completely compatible with
the rural image that the town seeks to foster (allegedly an element
in the special exception regime). The rather mechanical
application of these concepts by the Board in its March 1998
decision lends support to this concern, and the district court's
own decision rested largely on the view that the Board could and
likely would reject alternative proposals.
 Our own appraisal, which is de novo on summary judgment,
is more agnostic. The very breadth and vagueness of the criteria
that permit the Board to deny requests also give the Board some
flexibility in deciding whether to grant them. Equally important,
the strictures of New Hampshire and Amherst law are preempted,
under the Supremacy Clause of the Constitution, if they are read
and applied so as effectively to preclude personal wireless
service. See H.R. Conf. Rep. No. 104-458, supra, at 207-08
(affirming "preemption" in the "limited circumstances" described in
the provision). The minutes reflect that the Board more or less
understands this, and so would the New Hampshire state courts. 
Wenners v. Great State Beverages, Inc., 663 A.2d 623, 625-26 (N.H.
1995), cert. denied, 576 U.S. 1119 (1996).
 In all events, at least on the summary judgment record,
it has not been shown that the Board will inevitably reject an
alternative Omnipoint proposal with lower towers. Indeed,
conceivably Omnipoint could offer such an alternative with lower
towers and yet persuade the Board that, given the consequences
(more towers) and perhaps modest height reduction, the Board is
best off approving Omnipoint's original proposal or some close
variant (e.g., shifting one tower outside the historic district). 
It is too early to give up on the Board.
 Below, Omnipoint pressed an alternative ground that the
district court did not reach, namely, a claim that the Board's
actions were unsupported by substantial evidence. 47 U.S.C. 
332(c)(7)(B)(iii). Something should be said about this claim in
the interests of expedition since Omnipoint remains free on remand
to renew its request for summary judgment on this issue. The
substantial evidence question would ordinarily be resolved (one way
or the other) on the record before the district court and require
no trial.
 As already noted, the substantial evidence requirement is
centrally directed to those rulings that the Board is expected to
make under state law and local ordinance in deciding on variances,
special exceptions and the like. In a number of cases, courts have
overturned denials of permits, finding (for example) that safety
concerns and aesthetic objections rested upon hollow generalities
and empty records. See, e.g., Iowa Wireless Servs., L.P. v. City
of Moline, 29 F. Supp. 2d 915, 921-23 (C.D. Ill. 1998); AT&T
Wireless PCS Inc. v. City of Chamblee, 10 F. Supp. 2d 1326, 1331-33
(N.D. Ga. 1997). The substantial evidence test, which we have
recently described in some detail, involves some deference but also
has some bite. See Penobscot Air Servs., Ltd. v. FAA, 164 F.3d
713, 718 (1st Cir. 1999).
 Still, in this case Omnipoint's prospects of success on
this ground may be limited. The substantial evidence test applies
to the locality's own zoning requirements, and Amherst has framed
those requirements so they may be hard to fulfill unless the Board
exercises its judgment favorably to the applicant. But this in
turn makes Amherst more vulnerable to a claim, based on experience,
that its regime is an effective ban. Thus, the two federal
limitations--one dealing with bans and the other with substantial
evidence--complement one another by ensuring that local law is both
fair and is fairly administered.
 Before any further litigation, Omnipoint might find it
prudent to discuss with the Board an amicable resolution or an
agreed upon procedure to achieve one. The Board must also face
reality. If the Board's position is that it can just sit back and
deny all applications, that position in the end could, if
maintained, prove fatal to the Board rather than Omnipoint. Under
federal law, the town can control the siting of facilities but--as
several Board members admitted--it cannot preclude wireless service
altogether. Nor, in the face of a vigilant district court, can the
town exhaust applicants by requiring successive applications
without giving any clue of what will do the trick. Thus, it is in
the common interest of the Board and Omnipoint to find ways to
permit the siting of towers in a way most congenial to local
zoning.
 The statute's balance of local autonomy subject to
federal limitations does not offer a single "cookie cutter"
solution for diverse local situations, and it imposes an unusual
burden on the courts. But Congress conceived that this course
would produce (albeit at some cost and delay for the carriers)
individual solutions best adapted to the needs and desires of
particular communities. If this refreshing experiment in
federalism does not work, Congress can always alter the law.
 The district court's judgment is vacated and the matter
remanded for further proceedings consistent with this opinion. 
Each side shall bear its own costs on this appeal.
 It is so ordered.